SOMERSET & K. R. CO. (CHILDS v.). See Case No. 2,682.

———

## Case No. 13,171.

### SOMERVILLE v. The FRANCISCO.

[1 Sawy. 390.] [1]

District Court, D. California. Dec. 1, 1870.

SEAMEN—WAGES—AGREEMENT TO RENOUNCE.

An agreement made between the master and the cook of a fishing vessel by which the latter agreed to renounce his wages, earned and to be earned, and to accept in lieu thereof the catch of one of the seamen, pronounced unequal and unjust and to be disregarded by a court of admiralty.

[This was a libel for wages by Frederick Somerville against the brig Francisco.]

Daniel T. Sullivan, for libellant.
Milton Andros, for claimant.

HOFFMAN, District Judge. The libel in this case is filed to recover wages alleged to be due the libellant for services as cook on the above vessel, on her late fishing voyage from this port to the Okhotsk Sea. The shipment of the libellant as cook and the rate of wages agreed to be paid him are not disputed.

The defense set up is, that the libellant was incompetent and negligent. That the crew became discontented with the manner in which he discharged his duties, and demanded of the master that some change should be made. That the master thereupon proposed to the libellant to take the place of one Peterson, a fisherman on board, to relinquish to him the wages already earned by libellant as cook, and to receive in lieu thereof the fish already caught by Peterson, and the same share which Peterson was to receive of the fish, which he, libellant, might subsequently catch during the voyage.

That the libellant agreed to this arrangement, and that there is now due him only a share of the proceeds of the voyage, such as Peterson would have been entitled to.

In reply, the libellant alleges that he assented to the captain's proposition through fear and under duress.

By the terms of the articles each of the crew was to receive three tenths of the fish which he might individually catch, subject to certain specified deductions and charges. The vessel sailed on the tenth of April, 1870. The alleged agreement was made on the eighteenth of July. The voyage proved unprofitable. The amount which would be

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

due to the libellant under the alleged agreement is an inconsiderable sum, far less than the amount of his wages.

The allegations of the answer, and the proofs offered at the hearing, leave it somewhat uncertain whether the defense relied on is the incompetence and neglect of the libellant, and the consequent right of the master to withhold his wages in whole or in part, or a voluntary renunciation by him of his contract as cook, and the acceptance of a new employment on the same terms and conditions as those on which Peterson had contracted.

There can be no doubt that whenever an officer or mariner proves incompetent to discharge the duties he has contracted to perform, the master may degrade him, and the amount of his compensation will be determined not by the contract but by the value of the services he has actually rendered.

But, in this case the proofs of incompetence or negligence on the part of the libellant are wholly insufficient. Some dissatisfaction was manifested by the crew at Honolulu, but this seems to have been on account of the quantity rather than the quality or mode of cooking the food supplied them. If the latter was the case, it is by no means clear that it was occasioned by the fault of the cook. The captain himself appears to have assured the men that the libellant was a good cook, but offered to procure another if one could be had, provided the men would pay the three months extra wages required to be deposited on the discharge of a seaman in a foreign port. This the men declined to do, and the vessel proceeded on her voyage. On the eighteenth of July, some time after the vessel had arrived on the fishing grounds, the men were not furnished coffee as was usual when first called out in the morning, and no breakfast was prepared at the customary hour. They thereupon proceeded aft in a body, and informed the master that they could not and would not work unless their coffee was served to them and their breakfast prepared. The master then called the cook, or went to the galley and spoke to him, as the latter alleges, in a very violent and threatening manner. The excuse given by the cook was that the breakfast had been overturned by the heavy rolling of the ship, and that one of his hands was so sore from the effects of a splinter as to deprive him of its use.

Shortly afterwards the cook was called into the cabin, and the arrangement to take Peterson's place was entered into. It is proved that the ship was rolling very heavily, and that some of the dishes or pans on the stove were capsized. It is also proved that the cook's hand was and had for some days been sore and festered, so as greatly to interfere with the performance of his duties.

None of the crew who were examined allege any incompetence on the part of the cook. Some of them testify to his great desire to get through his work, and to his depriving himself of sleep for many consecutive hours. The coal on board also appears to have been nearly or quite unfit for use, and the drift wood used as fuel was wet and difficult to kindle. It was, moreover, necessary to saw or split it, which the cook, with a sore hand, found very difficult.

This, and the incident at Honolulu, are the only instances of alleged neglect mentioned by the witnesses. The master states, however, that almost every week during the voyage from here to the Okhotsk Sea he was obliged to speak to the cook about not giving the men enough, and that the crew were continually grumbling. But the men who were examined as witnesses make no serious complaints of an insufficient supply of food by the cook's fault. Some of them seem to consider that there was as much reason for dissatisfaction after as before the substitution of Peterson as cook in place of the libellant.

In view of all the testimony, I cannot consider that the incompetence or negligence of the libellant was such as to justify the master in disrating him, rescinding the contract, and depriving him of the opportunity of earning the wages agreed to be given him.

It need scarcely be observed that if the condition of his hand prevented him either wholly or partially from performing his duties, that circumstance affords no reason either for disrating him or denying him wages. A seaman disabled without his own fault, in the service of the ship, is entitled to be cured at the expense of the latter, and this without diminution of his wages.

The libellant, then, is entitled to recover, unless, by a voluntary and fair agreement, he has renounced his right to his wages earned and to be earned, and has entered into a new contract.

The courts of maritime law, mindful of the ignorance, the credulity, and the thoughtlessness of seamen, "have been in the constant habit," says Mr. J. Story, "of extending towards them a peculiar protecting favor and guardianship. They are emphatically the wards of the admiralty, and, though not technically incapable of entering into a valid contract, they are treated in the same manner as courts of equity are accustomed to treat young heirs dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees. * * * As they have little of the foresight and caution belonging to persons trained in other pursuits of life, the most rigid scrutiny is instituted into the terms of every contract in which they engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side not compensated by extraordinary benefits on the other side, the judicial interpre-

tation of the transaction is that the bargain is unjust and unreasonable, that advantage has been taken of the weaker party, and that pro tanto the bargain ought to be set aside as unjust and unreasonable." Harden v. Gordon [Case No. 6,047].

In the celebrated judgment of Lord Stowell in The Juliana (2 Dod. 504), the same principles were declared and vindicated. In that case it was held that where a voyage was divided by various ports of delivery, a proportional claim for wages attached at each of such ports, and that all attempts to evade or invade this right of the seamen by renunciations obtained from them without any consideration by collateral bonds, or by contracts inserted in the body of the articles, were ineffectual and void.

To the same effect are numerous American authorities. 3 Kent, Comm. 194, and cases cited; Mayshew v. Terry [Case No. 9,-361]; Knight v. Parsons [Id. 7,886]; The Brookline [Id. 1,937]; The Rajah [Id. 11,-538]; Relf v. The Maria [Id. 11,692]. Thus, it has been held that a stipulation in the articles to pay for all medicines and medical aid further than the medical chest afforded, was void as being grossly inequitable (Harden v. Gordon, ubi supra), and generally, that though the articles are conclusive as to the wages and voyage, yet, on all collateral points, the court of admiralty will consider how far the stipulations are equitable and just. 2 Hagg. Adm. 394. If the seaman contracting on shore and before the commencement of the voyage, is considered "as placed under the influence of men who have naturally acquired a mastery over him," by how much more must the seaman making an agreement with the master at sea, and subject to his absolute and arbitrary authority, be deemed to be acting under an undue and almost irresistible influence. To avoid a contract made under such circumstances, it is not necessary to show duress or compulsion. It is sufficient if it appear to be unequal and injurious to the weaker party. If it be unjust, it will be deemed to have been obtained by oppression or fraud. "No man," says Lord Stowell, "willingly submits to injustice knowing it to be such; and if he does submit to injustice it is upon advantage taken of his ignorance, or his weakness, or, in other words, by oppression or fraud." The Juliana, 2 Dod. 516.

What, then, are the circumstances of this case? An accident, coupled with a partial inability to work, owing to the condition of his hand, had prevented the libellant from preparing breakfast for the crew. The latter had complained in a body to the master. The master had harshly rebuked the libellant, and had threatened, as he says (and his testimony on this point is corroborated by that of other witnesses), to confine him and his son under the forecastle for the remainder of the voyage. Very shortly afterwards, and before there was time for his natural excite-

ment and alarm to subside, he was summoned to the cabin, and, in the presence of the two mates, the master proposes to him to renounce his rights under his contract, and to enter into a new one. He states that he objected, on the ground that he was no fisherman, and that his hand was too sore to permit him to fish. The master replied that his hand would soon be well. Not daring, as he says, further to oppose the master's will, he assented to the new agreement.

The libellant is an old man, and evidently not fitted to offer a determined resistance to oppression, or make a vigorous assertion of his rights. Few cases can be imagined short of actual or threatened violence where the parties to an agreement would stand upon more unequal grounds. On the one side authority and absolute power to compel obedience. On the other old age, weakness, and entire dependence.

Was then the agreement thus entered into in all respects fair and just to the libellant? If it was not, it is clearly void. By it he renounced three months' wages at $40 per month, already earned, together with all future earnings during the voyage. For this he received Peterson's share of the fish already caught by him, and was to receive a similar share of the fish he himself might thereafter take. It is doubtful whether he was exactly informed as to the number of fish which had, up to that time, been taken by Peterson, but it is quite clear that he had little idea either of the share which Peterson was to receive or what deductions were to be made and charges allowed on the settlement of the voyage. His hand was so sore as to disable him from work. It continued in nearly the same condition up to the end of the voyage.

In fact the number of fish caught by him was insignificant. On the final settlement of the voyage little or nothing was found due him under the new contract. He had no experience in or knowledge of fishing. The new duties he was required to undertake bore no analogy to the service he had contracted to perform.

Under these circumstances, can it be believed that the libellant voluntarily assented to the new agreement into which he entered? Or, if he did, can it be pronounced so fair, equal and just, that a court of admiralty should sustain and enforce it? To these questions, and especially to the last, a negative answer must be given.

But, in coming to this conclusion, I do not desire to be understood to impute to the master any wilful design to oppress or defraud the libellant.

He was probably somewhat dissatisfied with his performance of his duties. He knew that the condition of his hand disabled him from fully discharging them, and he probably felt at liberty to propose, perhaps to insist upon, an arrangement which would throw the consequences of that disability on the libellant, and not on the ship.

He perhaps forgot that the disability of the libellant even though it had been total, yet incurred, as it was without his fault and while in the service of the ship in no respect impaired his right to his wages. That the expense of procuring a substitute was an expense to be borne by the ship, and neither directly nor indirectly to be thrown upon the libellant; and that he had no right, in the relation he bore to him, to propose, still less to insist upon an unequal and injurious bargain of which the almost certain operation was to deprive the libellant of his wages for the entire voyage. For he must have known that three tenths of any fish the libellant might thereafter catch could not, after deducting the stipulated charges, by any possibility be equivalent to the monthly wages he renounced.

A decree must be entered in favor of the libellant for the amount of his wages for voyage, deducting his advance and the bill for articles furnished, produced by the master.